**SO ORDERED.**

**SIGNED this 27 day of May, 2008.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:                                              )
                                                    )
**TIMOTHY JOHN PADGETT and**                        )
**TRACIE ARLENE PADGETT,**                          )        **Case No. 07-41284**
                                                    )        **Chapter 13**
                                    Debtors.        )
_____)

### MEMORANDUM ORDER AND OPINION DENYING
### OBJECTION TO CONFIRMATION UNLESS AMERICREDIT
### CONTENDS CAR WORTH MORE THAN $14,615

AmeriCredit Financial Services, Inc. ("AmeriCredit") objects to confirmation of Debtors'

plan[1] because the plan bifurcates its claim, which is secured by a vehicle purchased by Debtors for

their personal use within 910 days of filing bankruptcy.

_____

[1]Doc. 14.

The parties have filed a Joint Stipulation of Facts,[2] which the Court adopts, and have also filed briefs on this issue. The Court has jurisdiction to decide this matter,[3] and it is a core proceeding.[4]

## I.    FINDINGS OF FACT

Debtors purchased a 2006 Toyota Corolla on March 22, 2007. In connection with this purchase, Debtors entered into a financing agreement and signed a promissory note that is currently held by AmeriCredit. The contract shows that the actual price of the Toyota was $16,288, and that Debtors paid $6,000.00 down on the purchase of the car, resulting in a $10,288 unpaid balance. The contract also required the lender to pay, on Debtors' behalf, a filing fee of $4, a net payoff of $11,350 owed on a 2000 Ford Windstar,[5] which Debtors traded in (which this Court will refer to as "negative equity"), and gap insurance in the amount of $600.00, bringing the total amount financed $22,242. Debtors agreed to pay 18.75% interest over 72 months, at $516 per month.

Six months later, Debtors filed their Chapter 13 bankruptcy petition and plan on September 19, 2007. The plan values the Toyota at $13,500 as of the date of filing, but nevertheless proposes to pay AmeriCredit $14,615, plus interest, on its "910 car loan."[6] AmeriCredit filed a proof of claim in this case reflecting a secured claim in the amount of $22,257.

---

[2]Doc. 41.

[3]28 U.S.C. § 1334.

[4]28 U.S.C. § 157(b)(2)(L).

[5]The debt on this car was$14,100. The dealer agreed to pay $2,750 for the trade-in of the Windstar, leaving a balance due to the Windstar's lender of $11,350.

[6]A "910 car loan" is a purchase money loan made for a vehicle that is for the personal use of the debtor and made within 910 days of the filing of a bankruptcy petition. As discussed in more detail below, 910 car loans receive special treatment under the Bankruptcy Code.

2

Debtors contend that the amount they are required to pay AmeriCredit as a secured claim through their Chapter 13 plan excludes the payoff amount on the vehicle they traded in. They contend that this amount is not a purchase money obligation, and can thus be crammed down. AmeriCredit claims that the entire amount financed, including the amount that was used to pay off the negative equity in Debtors' trade-in, constitutes a purchase money obligation and must be paid in full pursuant to the hanging paragraph in 11 U.S.C. § 1325(a).[7] Finally, both parties agreed to be bound by their stipulation of facts, and that stipulation contains no agreement that the sale would not or could not have been consummated unless the retail seller was willing not only to take Debtors' vehicle in trade but also to pay off the negative equity on that vehicle.

Additional facts will be discussed below, when necessary.

## II.    ANALYSIS

Before the enactment of BAPCPA, secured creditors' claims could be bifurcated into secured and unsecured portions, based on the value of the collateral securing the debt. The accepted vernacular for such bifurcated claims was that the claim was "crammed-down" to the value of the collateral, and the secured value was the amount required to be paid over the life of the Chapter 13 plan, with interest at the rate mandated by the Supreme Court's decision in *Till. v. SCS Credit Corp.*[8]

---

[7]This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) became effective. Pub. L. 109-8. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless other specifically noted.

[8]541 U.S. 465, 484-85 (2004) (adopting formula approach, requiring adjustment of prime national interest rate based on risk of nonpayment).

3

BAPCPA opted to differentiate between the treatment required for creditors who loaned money for a debtor to purchase a motor vehicle, for personal use, within 910 days preceding the filing date, and other creditors. It did so by inserting an unnumbered paragraph at the end of § 1325(a)(9), which clearly appears not to be a part of—or even related to subsection (9) (which conditions confirmation on debtor's compliance with the duty to file required tax returns), but instead appears related to § 1325(a)(5). The hanging paragraph, which is oftentimes cited as § 1325(a)(*) in judicial opinions, states, in pertinent part, as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in Section 30102 of title 49) acquired for the personal use of the debtor...."

The applicable subsection of § 506 is § 506(a)(1), which provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ."

Accordingly, the language contained within the hanging paragraph makes the value of the collateral irrelevant in determining the allowed amount of a claim secured by a purchase money security interest ("PMSI") in a vehicle acquired for the personal use of the debtor within 910 days of the bankruptcy filing. And unless the amount of the claim is subject to reduction for reasons other than collateral value, the creditor's allowed secured claim is fixed at the amount of the underlying debt under nonbankruptcy law. For secured claims that are not within the confines of the hanging paragraph, § 506(a)(1) still governs, and those secured claims can be crammed down to the value of the collateral in the Chapter 13 plan.

Case 07-41284   Doc# 52   Filed 05/27/08   Page 4 of 18

As a result, this Court cannot confirm a plan that attempts to cram down the claim of a creditor that extended credit to a debtor for the purpose of purchasing a vehicle for a debtor's personal use when that purchase occurred within two and one-half years of the date of filing. Here, Debtors argue they are not cramming down that part of AmeriCredit's claim that is represented by the purchase price of the vehicle purchased within 910 days. Their plan proposes to pay more than the net purchase price of that vehicle, after deduction of the down payment, plus interest over the life of the plan. Instead, what Debtors' plan attempts to do is cram down that portion of AmeriCredit's claim that is based upon paying off the remaining debt on Debtors' trade-in vehicle, claiming that portion of AmeriCredit's claim is not a PMSI. Conversely, AmeriCredit argues that the entire amount it loaned Debtors constitutes purchase money, and that no portion of its claim may be crammed down.

The first sentence of the "hanging paragraph" specifically states that "[f]or purposes of paragraph (5) [of §1325(a)], section 506 shall not apply to a claim described in that paragraph <u>if the creditor has a purchase money security interest securing the debt that is the subject of the claim</u> ...."[9] Whether a creditor has a purchase money security interest securing a debt is a matter of state law;[10] the law of the state of Kansas is, therefore, applicable here, since the stipulated documents show the transaction occurred in Topeka, Kansas.

---

[9]Section 1325(a) (emphasis added).

[10]*In re Billings*, 838 F.2d 405 (10th Cir. 1988) (holding courts must look to the law of the state in which the security interest was created to determine if creditor retains a purchase money security interest despite refinancing) and *In re Horn,* 338 B.R. 110, 113 (Bankr. M.D. Ala. 2006).

Revised § 9-103(b) of the Uniform Commercial Code, as adopted and modified in Kansas, defines a "purchase-money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[11]  In other words, to have a PMSI, an otherwise secured party has the burden of proof[12] to satisfy two key elements: 1) that the money loaned or credit extended made it possible for the debtor to obtain the collateral, and 2) that debtor used the funds supplied to acquire rights in the collateral.  Under Kansas law, a security interest in collateral may be both a purchase money security interest and a non-purchase money security interest.[13]

The key issue in this case is, therefore, whether AmeriCredit's PMSI in Debtors' automobile includes the amount AmeriCredit paid to retire the debt on the Windstar that Debtors traded, or whether the PMSI is limited to the actual cost of the new vehicle, along with transactional items such as taxes and title fees.  This Court has already addressed this issue, albeit on somewhat different facts, in *In re Vega*.[14]  In *Vega*, the debtors obtained a loan to purchase a newer vehicle from the same lender that had financed another vehicle purchase, which earlier loan remained unpaid at the time of the second transaction.  In addition to financing the actual purchase price of the new vehicle, the lender required debtors borrow additional funds, as part of the same transaction, to retire

_____

[11]K.S.A. 84-9-103 (2001).

[12]A secured party claiming a purchase money security interest has the burden of establishing the extent to which the security interest is a purchase-money security interest. K.S.A. 84-9-103(g).

[13]Keith G. Meyer, *A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code*, 50 U. Kan. L. Rev. 143, 156 (2001) (providing a thorough explanation of the dual-status doctrine and the transformation rule); *In re Gibson*, 16 B.R. 257, 267 (Bankr. D. Kan. 1981).

[14]344 B.R. 616 (Bankr. D. Kan. 2006).

6

the debt on prior loan; the other vehicle was not being traded in.  Like in this case, that original loan was significantly undersecured by the value of the first vehicle.

The Vegas then filed for bankruptcy protection within 910 days of purchasing the new vehicle.  They proposed to pay the lender the full amount of its claim pursuant to § 1325(a)(*), with the exception of the amount of the claim that resulted from paying off the debt on the other vehicle.  The debtors argued that the "rolled over" portion of the claim did not constitute a purchase money interest, and was not subject to the hanging paragraph.  This Court agreed, holding that under the Kansas version of the Uniform Commercial Code, only that portion of the claim that is directly attributable to the actual purchase of the new vehicle is a purchase money obligation, and any portion of the claim representing payment of an antecedent debt is not a purchase money obligation.

This issue was also recently addressed by the United States District Court for the District of Kansas in *CitiFinancial Auto v. Hernandez–Simpson.*[15]  *Hernandez-Simpson* presented facts that are essentially indistinguishable from our facts.  The debtors, in connection with the purchase of a new vehicle, desired to trade in a vehicle in which they owed more than the vehicle's value.  The lender financing the new purchase agreed to pay off the debt on the vehicle being traded in as a part of the same transaction.  In affirming the bankruptcy court's decision, the District Court held that the creditor "does not have a PMSI for the full amount of its claim.  Instead, under the dual-status rule, the excess trade-in balance is an unsecured antecedent debt, which is not entitled to purchase-money treatment under § 1325(a)."[16]  The Court reached this determination by applying the same reasoning

---

[15]369 B.R. 36 (D. Kan. 2007).

[16]*Id*. at 48 (also holding that "Providing a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle, is not value given to 'enable' that consumer to acquire rights in or the use of the

applied in *Vega*—that the payment of the negative equity in the traded in vehicle was 1) not part of the purchase price of the new vehicle, and 2) was not value given to enable the debtors to obtain rights in the new vehicle.[17]

A different result was recently reached, on essentially identical facts, by another judge in this district in *In re Ford*.[18] In *Ford*, Judge Nugent held that the portion of a loan used to cover the negative equity in a trade-in fit into both prongs of the definition of a purchase money

---

replacement collateral. The term 'enable' refers to what it has always referred to, which is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves." (quoting *In re Peaslee*, 358 B.R. 545, 557 (Bankr. W.D.N.Y. 2006), rev'd, *General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007)).

[17]This continues to be the majority holding, at least today. Some of the more recent decisions that have reached a similar result—that financing negative equity is not part of purchase money, are *In re Callicott*, __ B.R. __, 2008 WL 1732934 (Bankr. E.D. Mo. 2008); *In re Riach*, 2008 WL 474384 (Bankr. D. Or. 2008); *In re Look*, 383 B.R. 210 (Bankr. D. Me. 2008); *In re Johnson*, 380 B.R. 236 (Bankr. D. Or. 2007); *In re Mitchell*, 379 B.R. 131 (Bankr. M.D. Tenn. 2007); *In re Conyers*, 379 B.R. 576 (Bankr. M.D.N.C. 2007); *In re Sanders*, 377 B.R. 836, 853 (Bankr. W.D. Tex. 2007); *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla . 2007); *In re Pajot*, 371 B.R. 139, 149-50 (Bankr. E.D. Va. 2007); *In re Price*, 363 B.R. 734, 741-42 (Bankr. E.D.N.C. 2007) (holding that coupling the finance of the negative equity on the same document as the purchase of the car does not change the "price" of the car, noting instead that there were actually "two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties"); *In re Acaya*, 369 B.R. 564, 570 (Bankr. N.D. Cal. 2007); and *In re Bray*, 365 B.R. 850 (Bankr. W.D. Tenn. 2007).

[18]___ B.R. ___, 2008 WL 2095677 (Bankr. D. Kan. 2008). This decision is on appeal to the Tenth Circuit Court of Appeals Bankruptcy Appellate Panel, Case No. 08-049, and the appellant has filed a certificate for a direct appeal to the Tenth Circuit, citing the split in the District on the issue. Some of the decisions holding that financing of negative equity does constitute part of the purchase money are *In re Dunlap*, 383 B.R. 113 (Bankr. E.D. Wis. 2008); *In re Austin*, 381 B.R. 892 (Bankr. D. Utah 2008); *In re Weiser*, 381 B.R. 263 (Bankr. W.D. Mo. 2007); *In re Schwalm*, 380 B.R. 630, 631 (Bankr. M.D. Fla. 2008); *In re Burt*, 378 B.R.352 (Bankr. D. Utah 2007); *In re Wall*, 376 B.R. 769 (Bankr. W.D.N.C. 2007); *GMAC v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007); *Graupner v. Nuvell Credit Corp*., 2007 WL 1858291 (M.D.Ga. June 26, 2007); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y. 2007); and *In re Turner*, 349 B.R. 437 (Bankr. D.S.C. 2006).

8

obligation—the purchase price and the value given to enable the purchase. As a result, the entire amount of the creditor's claim is entitled to protection under § 1325(a)(*).

Judge Nugent relied, in part, on the following language contained in Official Comments to the Uniform Commercial Code:

> [T]he 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.[19]

The court held that the phrase "obligations for expenses incurred in connection with acquiring rights in the collateral" includes negative equity from a trade in. The court also noted that there must be a close nexus between the acquisition of the collateral and the secured obligation, and that this requirement was also met in the context of paying off negative equity in a trade in. In addition, the court in *Ford* also relied on Barkley Clark's Article 9 treatise,[20] which concludes that repayment of negative equity "fit[s] snugly into both prongs" of the definition of a purchase money obligation, even though only one prong of the definition needs to be satisfied.[21]

Because this Court's *Vega* opinion was one of the first issued post-BAPCPA on this issue, the Court has reviewed most of the myriad decisions around the country, and the analysis used in each, to determine if its analysis in *Vega* remains viable. The Court now reaffirms its decision in *In re Vega* that negative equity rolled into the loan acquired for the purchase of a new vehicle does not constitute a purchase money obligation, and can be crammed down in a Chapter 13 case,

---

[19]K.S.A. 84-9-103, Official Comment 3.

[20]Barkley Clark, 2 The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 12.05[10][b][vii], pp. 12-103-104.5 (Rev. ed. 2007).

[21]*Id.* at p. 12-104.1.

9

notwithstanding the provisions of § 1325(a)(*).  In addition to the reasoning set forth in *Vega* and *Hernandez-Simpson*, the Court also finds that the Official Comments to the Uniform Commercial Code are more supportive of this holding, than a holding to the contrary.  As noted above, the Official Comments state:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.[22]

The Official Comment provides a fairly lengthy, detailed list of items that are included in the "price" of collateral or the "value given to enable" the borrower to acquire rights in the collateral.  Although the list is clearly not intended to be exhaustive given the phrase "and other similar obligations" contained at the end, the Court does find that any such "other similar obligations" must be of the same type of obligations listed in the comment in order to be included.[23]

The Court also disagrees with those courts that hold that refinancing thousands of dollars of negative equity easily or logically fits within the "expenses incurred in connection with acquiring rights in the collateral" provision.  "The collateral" referenced is the new car—not the trade-in.  Paying off an antecedent, undersecured loan on another vehicle is not the kind of "expense" to which the Comment appears to be geared.  All of the specific items named in the Official Comment relate directly to actual acquisition of property rights in the newly acquired collateral.  Without the

---

[22]K.S.A. 84-9-103, Official Comment 3.

[23]*See In re Wear*, 2008 WL 217172 (Bankr. W.D. Wash. Jan. 23, 2008).  *See also Niang v. Gonzalez*, 422 F.3d 1187, 1198 (10th Cir. 2005) (applying the Latin maxim *ejusdem generis* in holding that when several specific items are named, followed by a more general word or phrase, any additional items are restricted to those that are the same kind as the specifically named items).

10

payment of items such as taxes, title fees, duties and freight charges, an individual generally cannot acquire title to a vehicle.[24]

The same cannot be said about the payment of negative equity in a vehicle that is to be traded in. Although including the payoff of the prior loan as part of the new loan is certainly convenient for both the lender and the borrower, and the lender may not be willing to loan the money for the new car unless the other loan is paid off, the payoff of the negative equity in the trade-in is not necessary to acquire rights in the new car in the same manner as the items listed in the Official Comments. Further, the language of K.S.A. 84-9-103(b) requires that the value given to enable a debtor to acquire rights in the collateral "is in fact so used." Here, the $11,350 was not "in fact" used to buy the 2006 Corolla, but instead to retire an undersecured antecedent debt ancillary to that purchase.

The Court also agrees with the analysis in *In re Pajot*, which articulately discusses the reasons why declining to include negative equity as part of a purchase money obligation also makes good policy sense:

> The bankruptcy laws must necessarily balance between making capital available to individuals and providing relief to those same individuals from improvident use of debt. The payoff of negative equity on an old vehicle often gives a desirable financial push for debtors to acquire a new vehicle. Many debtors likely could not afford to purchase a new vehicle while paying off the debt on both the new vehicle and an old one. Thus, it is important for debtors to have negative equity payoffs available in the menu of financing opportunities to purchase a new car. This court's decision enforcing the dual status rule will not prevent

---

[24] *In re Mitchell*, 379 B.R. at 137 (noting that "[c]learly, the expenses the drafters had in mind were essentially transaction costs; not every expense that makes a transaction possible should be considered an enabling expense.) *See also In re Westfall*, 365 B.R 755, 762 (Bankr. N.D. Ohio 2007) (questioning whether the creditor's argument could be extended to cover the payment of a doctor's fee as an enabling expense if a debtor would not have made it to the dealer's lot without an emergency appendectomy").

Case 07-41284   Doc# 52   Filed 05/27/08   Page 11 of 18

negative equity payoffs because such financing already occurred with relatively high frequency prior to BAPCPA.

The opposite decision, including negative equity payoffs as a portion of a non-bifurcatable secured claim, may actually provide too great an incentive for creditors making such capital available to debtors.  While an increase in capital availability could arguably be even better for debtors, this court is hesitant to make such a proclamation because many individuals facing a negative equity "deal" to buy a new car are not facing a critical capital crisis with respect to transportation.  This is not to say that their financial outlook is positive, but these debtors have a functioning car worthy of a trade-in.  None of the debtors in these four consolidated cases traded in a vehicle more than four years old, nor did they acquire a second vehicle more than one year old. A new car does not appear to be a critical need for many individuals in this situation.

These seemingly unrequired purchases illustrate why so many American consumers have financial problems.  No small part of the problem is the excessive availability of capital that creates opportunities for imprudent borrowing.  <u>If negative equity were to be included as a purchase-money security interest, lenders would be rewarded for rolling in as much negative equity as possible.  It would enable the creation of a security interest out of what otherwise would have been unsecured out of bankruptcy, creating a significant predatory lending problem whereby the creditor could actually receive more out of a bankrupt debtor than it would otherwise.</u> As a result, those debtors on the brink of bankruptcy will suddenly find themselves inundated with the opportunity to do exactly what they should not be doing-acquiring another large unnecessary item on credit.  Accordingly, the court is not uncomfortable with limiting the availability of negative equity financing by finding that negative equity is not protected from bifurcation by the hanging paragraph.[25]

This Court also constantly sees cases where debtors have acquired vehicles that seem to be financially out of reach for many non-financially stressed consumers, let alone those who are on the brink of bankruptcy.  Discouraging this practice, by not calling payment of an antecedent debt "purchase money" when it is not, is probably a good thing, and may well be why the drafters of the UCC, and the Official Comments thereto, did not appear to contemplate the inclusion of negative equity as part of purchase money.

---

[25]*In re Pajot,* 371 B.R. at 164 -165 (emphasis added).

Admittedly, this situation of potential predatory lending is more likely to occur under the facts of *Vega*, where that creditor required its own mostly unsecured, antecedent debt to be rolled in to, and in essence converted to, secured debt. The same problem can occur, however, even when one creditor is paying off another creditor's antecedent debt, at least since the enactment of the 910-day rule, which magically entitles the second lender's entire loan to be given secured status– at least if one finds that the negative equity portion is entitled to PMSI treatment. Some creditor is getting paid 100% on its debt, notwithstanding that a significant part of that debt is essentially unsecured. The Court does not believe that Congress intended that result in adopting the language of § 1325(a)(*), because such result upsets the Congressional priority scheme in bankruptcy.

The Court also does not believe that in adopting the 910-rule, Congress intended to enlarge what was truly a purchase money obligation—money for the actual acquisition of the new vehicle—into something much broader. Prior to BAPCPA, vehicle lenders could be harmed by a debtor who acquired a vehicle in the months leading up to bankruptcy, then filed bankruptcy and crammed the creditor's claim down to the collateral value on the date of filing. Because of rapid depreciation of motor vehicles, debtors could unfairly reap a benefit by cramming down the debt, only paying a secured claim equal to the depreciated value of the car. In enacting the hanging paragraph, Congress fixed this disparity to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy a short time later.[26] This Court is unaware that in lobbying for a Congressional fix to this known problem, auto creditors also

---

[26]*In re Pajot*, 371 B.R. at 159. *See also In re Lavigne*, 2007 WL 3469454 at * 11 (Bankr. E.D. Va. 2007).

13

sought the right to loan more than the cost of the vehicle, by paying off negative equity or otherwise, and still have that additional amount be deemed purchase money.

The Court thus finds, as it did in *In re Vega*, that the negative equity in the vehicle Debtors traded, which was made a part of the financing agreement in the purchase of the new vehicle, is not a purchase money obligation, and as such is not entitled to the anti-cram down provisions of the hanging paragraph. Although the Court agrees with AmeriCredit that the facts in *Vega* are somewhat distinguishable from those in this case—and as noted above, the *Vega* facts are probably more insidious because that creditor can turn its own undersecured obligation into a secured debt, the distinction is without a difference regarding the overall analysis of the issue. The Court thus respectfully disagrees with the holding in *In re Ford*, and finds that the negative equity payoff obligation is not necessary to the transaction, is not of the same type or magnitude[27] as the other items listed in Official Comment 3, and there is an insufficiently close nexus between retiring the antecedent debt on the trade-in vehicle and acquiring a new vehicle to constitute purchase money.[28]

---

[27]Courts have described the items listed in Comment 3 as "incidental and directly related expense[s]," insubstantial when compared to the actual sales price of the vehicle. Here, the financing of the negative equity constituted over 50% of the transaction—hardly incidental or insubstantial. *See, e.g., In re Pajot*, 371 B.R. at 153.

[28]*See, e.g., In re Sanders*, 377 B.R. at 853-55, finding that the creditor's argument that the debtor would not have been able to buy the car unless the lender had taken the upside-down vehicle in trade and paid off the negative equity, thus enabling the debtor to "acquire rights in the collateral" proves too much. "By this logic, were the dealer prepared to pay off some of the debtor's credit card debt to help the debtor <u>qualify</u> for the car loan, that too, following [creditor's] logic, would be 'value given to enable the debtor to acquire rights in the vehicle,' as the debtor could be said not to be able to obtain the financing necessary to buy the vehicle unless other debt was first paid down. One needs only a few imaginative moments to think of other examples so far afield that even [creditor] would have to eventually admit that the formulation would effectively drain "purchase money" of any valid meaning." (Emphasis added)

14

As an alternative basis, the Court finds that AmeriCredit did not meet its burden of demonstrating, under the stipulated facts of this case, that the negative equity financing "enabled" Debtors to purchase this vehicle.[29] That proof was not forthcoming because the parties' stipulation of facts is entirely silent on that issue. Accordingly, even if the Court is incorrect in finding that the negative equity financing is not part of the price or did not "enable" Debtors to acquire the vehicle, the fact that AmeriCredit did not carry its burden of proof on these particular facts is enough to conclude that the negative equity was not part of the PMSI transaction in this case.

## III.    Remaining factual issue

Although the Court has now decided the major legal issue in this case, there remains a possible factual dispute that the parties must resolve before the Court can confirm Debtors' Chapter 13 Plan. The Court has found that AmeriCredit's purchase money security interest at the time the contract was signed was at least $10,288, and could have been as much as $10,892 depending on the treatment of the gap insurance and the filing fee. So Debtors must pay at least that amount—or the amount due on some pro-rated basis, accounting for payments made since the transaction. However, Debtors have valued the car at $13,500.00, and § 506(a)(1) only allows AmeriCredit's secured claim to be crammed down to that value, whether it is a purchase money obligation or not.

In other words, although the negative equity portion of the trade is not entitled to purchase money status subject to the hanging paragraph, it is still a secured debt that is subject to the limitations of § 506(a)(1). AmeriCredit thus still has a lien on the Toyota "to the extent of the value of [AmeriCredit's] interest in the estate's interest in such property." However, nothing in the

---

[29]*See In re Hayes*, 376 B.R. 655, 673 (Bankr. M.D. Tenn. 2007) and *In re Mitchell*, 379 B.R. 131, 138 (Bankr. M.D. Tenn. 2007), both holding that creditor failed to meet burden of proof on key elements.

15

parties' stipulation indicates what the value of the car actually was on the date of filing. Paragraph 8 merely states "Debtors' Plan values the vehicle at $13,500.00 but directs AmeriCredit's claim to be paid $14,615.00, paid at the discount rate." Accordingly, the Court will give AmeriCredit the opportunity, within 10 days from the date of this order, to file an objection to the proposed value of the Toyota if it contends Debtors, in agreeing to pay $14,615,[30] have undervalued the vehicle.[31]

If AmeriCredit does not claim that the 910 car was actually worth more than $14,615 at filing, then the Trustee may submit a confirmation order, which in incorporating Debtors' plan will require payment of $14,61, plus interest at the *Till* rate.

## IV. CONCLUSION

Because financed negative equity is neither an obligation incurred as "all or part of the price of the collateral" or an obligation incurred "for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" for purposes of K.S.A. 84-9-103, the

---

[30]As an aside, the Chapter 13 plan filed in this case claims that the contract included $11,954 to pay off the prior loan, apparently lumping the gap insurance and the filing fee in with the payoff of the prior loan for some reason. The plan also states that a trade-in value of $6,000 was allowed on the other vehicle, bringing the net amount financed for the payoff of the traded car to $5,954, and the total amount financed to $22,242. However, as noted above, and pursuant to the actual contract attached to AmeriCredit's Proof of claim, the $6,000 amount was actually the down payment made by Debtors toward the purchase of the new car, not the value of the trade-in, and the $11,350 amount is the net amount paid to the prior lender after taking into consideration the value of the trade.

[31]AmeriCredit attached a document to their Objection to Confirmation of Plan that provides the N.A.D.A. valuation of the 2006 Toyota Corolla. According to this valuation, the full retail value of the vehicle is $13,750, the wholesale/trade-in value is $11,625 and the retail/wholesale average is $12,680.50. Although that attachment certainly makes the Court believe that AmeriCredit would not dispute a $14,615 value,, none of these values were stipulated to by the parties. The N.A.D.A. value of the vehicle is only a starting point for the Court in determining the value of a vehicle and AmeriCredit will be given the opportunity to present evidence that the actual value of this vehicle is higher than the N.A.D.A. valuation, if it chooses to do so.

16

negative equity portion of the transaction between AmeriCredit and Debtors is not a purchase money obligation. Because that portion is not a purchase money obligation, § 1325(a)(*) does not apply to the portion representing negative equity. That bifurcation of the loan, however, does not destroy the loan's purchase money character for the portion that does constitute purchase money under the dual status rule applicable in Kansas, as explained in *Vega*.

The Court thus denies AmeriCredit's general objection to confirmation of Debtors' Chapter 13 plan. Debtors are required, however, pursuant to § 1325 and § 506, to pay the value of the vehicle, which Debtors have indicated is $13,500---an amount admittedly larger than the purchase money security interest AmeriCredit has. Debtors' plan actually proposes to pay $14,615, which is more than it contends the car was worth on the date of filing.

If AmeriCredit contends the 2006 Toyota was worth more than $14,615 on the date of filing, it must object to that valuation within 10 days. If no objection is filed, the Court will confirm the plan, which provides Debtors shall pay AmeriCredit $14,615, with interest at the Chapter 13 Trustee's discount rate, over the life of the plan.

**IT IS, THEREFORE, BY THE COURT ORDERED**, that AmeriCredit's Objection to Confirmation of Debtors' Chapter 13 Plan[32] is overruled to the extent it argued that Debtors were required to pay its claim in full. AmeriCredit is given 10 days to file any objection to Debtors' plan to pay $14,615 to AmeriCredit if it contends the 2006 Toyota Corolla was worth more than that on the date of filing. If no objection is filed within that 10 day period, the Trustee may submit an order confirming the plan if Debtors are making their required plan payments.

---

[32]Doc. 14.

17

The Court continues this case to the confirmation docket on **June 25, 2008 at 1:30 p.m.** for monitoring purposes, so that if AmeriCredit does file an objection regarding valuation, the Court can determine the most expeditious method to resolve that remaining dispute. That hearing will be canceled if no objection to valuation is filed and the Trustee submits the confirmation order.

###